# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# ASHEVILLE DIVISION
# CIVIL CASE NO. 1:23-cv-00098-FDW

| | |
|---|---|
| RODWYN ANTONIO TAYLOR, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **MEMORANDUM OF** |
| vs. ) | **DECISION AND ORDER** |
| ) | |
| ) | |
| JAMES W. RAMSEY, et al., ) | |
| ) | |
| Defendants. ) | |
| _____) | |

**THIS MATTER** comes before the Court on Defendants' Motion for Summary Judgment. [Doc. 64] and Defendants' Motion to Seal [Doc. 69].

## I.  PROCEDURAL BACKGROUND

On April 7, 2023, Plaintiff Rodwyn Antonio Taylor ("Plaintiff"), proceeding *pro se*, filed this action pursuant to 42 U.S.C. § 1983 for the alleged used of excessive force on Plaintiff by two unidentified correctional officers at Mountain View Correction Institution ("Mountain View") in Spruce Pine, North Carolina, in violation of the Eighth Amendment. [Doc. 1]. Plaintiff alleged that, on December 23, 2021, while he was incarcerated at Mountain View and fully restrained in a "restraint chair" two Doe Defendants assaulted him. [Id.]. Plaintiff's case passed initial review, but he amended his Complaint after viewing video footage of the incident, which the Court ordered to assist him in identifying the Doe Defendants. [Doc. 10]. In his Amended Complaint, Plaintiff alleged that, as he was retreating and posed "no threat," he was assaulted by two Doe Defendants before he was placed in a restraint chair and that he was assaulted by a third Doe Defendant while in the restraint chair. [Doc. 27]. Plaintiff's Amended Complaint passed initial review, and the

Doe Defendants were identified as James W. Ramsey and Kody Hughes. [Docs. 28, 29; see Doc. 48]. Plaintiff alleged having suffered a "bruised face" and a "broken hand" requiring surgery, as well as mental and emotional distress. [Doc. 27 at 5, 8]. He seeks monetary relief, including punitive damages. [Id. at 9].

On November 4, 2024, Defendants moved for summary judgment. [Doc. 64]. Defendants argue that summary judgment should be granted because 1) Plaintiff failed to exhaust his administrative remedies relative to his claim against Defendant Hughes, 2) Defendants did not use excessive force on Plaintiff, and 3) qualified immunity bars Plaintiff's claim against Defendants. [Doc. 65]. In support of their summary judgment motion, Defendants submitted a brief, Plaintiff's grievance records, the relevant Incident Report, and 451 pages of Plaintiff's medical record.[1] [Docs. 65-68].

Thereafter, the Court entered an order in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the summary judgment motion and of the manner in which evidence could be submitted to the Court. [Doc. 71]. The Plaintiff was specifically advised that he "may not rely upon mere allegations or denials of allegations in his pleadings to defeat a summary judgment motion." [Id. at 2]. Rather, he must support his assertion that a fact is genuinely disputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." [Id. (citing Fed. R. Civ. P. 56(c)(1)(a))]. The Court further advised that:

> An affidavit is a written statement under oath; that is, a statement

---

[1] Notably, Defendants did not submit their own affidavits or affidavits authenticating the records submitted in support of their motion.

> prepared in writing and sworn before a notary public. An unsworn statement, made and signed under the penalty of perjury, may also be submitted. Affidavits or statements must be presented by Plaintiff to this Court no later than fourteen (14) days from the date of this Order and must be filed in duplicate.

[Id. at 3-4 (citing Fed. R. Civ. P. 56(c)(4))]. Plaintiff did not object to the form of Defendants' forecast of evidence.[2] See Fed. R. Civ. P. 56(c)(2); Humphreys & Partners Architects, L.P. v. Lessard Design, Inc., 790 F.3d 532, 538-39 (4th Cir. 2015). Plaintiff filed only a two-page unsworn response to Defendants' motion [Doc. 74] and a four-page unsworn supplemental response [Doc. 79; see Doc. 76]. Additionally, Defendants submitted video footage of the incident on Plaintiff's behalf as ordered by the Court. [Docs. 76, 77]. Neither of Plaintiff's Complaints in this matter were verified or otherwise submitted under penalty of perjury and, therefore, cannot be considered for their evidentiary value here. See Goodman v. Diggs, 986 F.3d 493, 498-99 (4th Cir. 2021) (holding that a district court is to consider verified prisoner complaints as affidavits on summary judgment "when the allegations contained therein are based on personal knowledge"). As such, Plaintiff's only forecast of evidence is unauthenticated video footage.[3]

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a

---

[2] The Court, therefore, will consider Defendants' materials as part of the forecast of evidence here.

[3] Because Defendants did not object to the form of this evidence, the Court will consider it here. The Court notes that much of the footage is obscured and/or unclear because of the camera angle, the placement of the bars along the third-floor tier where much of the incident occurred, and the distance from the camera to the events depicted. The Court includes its observations of the events depicted in the footage in the forecast of evidence as these limitations allow.

verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" in the record. See id.; Fed. R. Civ. P. 56(c)(1)(a). Courts "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Eastern Shore Mkt. Inc. v. J.D. Assoc.'s, LLP, 213 F.3d 174, 180 (4th Cir. 2000). The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. Facts, however, "must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007).

4

## III. FACTUAL BACKGROUND

The relevant forecast of evidence, in the light most favorable to the non-movant, shows the following.

On December 23, 2021, Plaintiff consumed K2, a synthetic cannabinoid. At around 7:10 a.m., a Code 3 was called and Officer Warren responded to screaming coming from Plaintiff's cell, which was on the upper level of E-Wing at Mountain View. When Officer Warren arrived at Plaintiff's cell, Plaintiff was on the floor screaming. When Plaintiff saw Officer Warren, he stood up and aggressively exited his cell and squared up to Officer Warren in a fighting stance. Plaintiff balled up his fists, began screaming even louder, and started throwing closed fist punches at Officer Warren. Plaintiff struck Officer Warren in the arm. Officer Warren administered pepper spray to Plaintiff's face with no effect. Plaintiff refused orders to stop and submit to restraints. Defendant Hughes and Officers Steven Daniels and Bobby Daniels also responded to the Code 3 and ordered Plaintiff to submit to restraints. Plaintiff turned toward the responding officers and started punching and kicking at them. Defendant Hughes then administered pepper spray to the Plaintiff's face, again having no effect. Plaintiff turned toward Officer Warren, punching at him and attempting to kick him.[4] At this time, Defendant Hughes and Officers Warren and Steven Daniels drew their batons and extended them. Defendant Hughes used two forward strikes to Plaintiff's upper thigh area. Plaintiff fell to the ground and continued to kick the officers, striking Officer Steven Daniels in the shin and Defendant Hughes in the hand. Officer Steven Daniels struck Plaintiff twice with his baton on Plaintiff's upper thigh area. Plaintiff returned to his feet and proceeded to the shower area. At this time, Officer Warren used a forward strike to Plaintiff's rear knee area. Plaintiff then followed orders to get on the ground but continued to be noncompliant

---

[4] At some point during these events, a Code 4 was called due to Plaintiff assaulting staff.

5

and actively resisted and struggled with the officers, who were attempting to get Plaintiff onto his stomach. Defendant Hughes returned his baton to its holder, took control of Plaintiff's right arm, and assisted in placing Plaintiff in restraints. Officer Grear, who had arrived at the end of the tier, and two of the other officers assisted in applying handcuffs while Plaintiff continued to struggle. Once the officers were able apply the handcuffs, Plaintiff continued to resist, refusing to get lifted off the floor. After giving control of Plaintiff to another officer, Defendant Hughes had no further contact with the Plaintiff.

    The officers present tried to calm the Plaintiff for escort. Plaintiff, however, remained noncompliant and continued to resist being lifted off the floor. At 7:14:37 a.m., an officer can be seen trying to lift Plaintiff off the ground by pulling up on his hands, which are restrained behind his back, while other officers are trying to lift him up by his arms. The other officers drop his arms, while the officer holding Plaintiff's hands continued to lift them up. Plaintiff persisted in resisting being lifted off the ground. At which time, some of the officers started to drag Plaintiff on the ground from the end of the tier toward the stairs. In the meantime, Officer Grear retrieved leg restraints for use with a stair chair, which is a chair that allows correctional staff to safely move a noncompliant inmate down the stairs. Defendant Ramsey and Sergeant Travis Payne used hands on force to place Plaintiff in the stair chair, assisted by Officers Grear and Bobby Daniels and Sergeant Amanda Laws. Once in the chair and after Plaintiff was wheeled to the stairs, he appears to intentionally slump down and pull himself completely off the seat of the chair. Officers were able to pull him back onto the seat from behind as Plaintiff continued to squirm and struggle. Although the view is mostly obstructed, officers can be seen working to gain control of the Plaintiff and presumably resituate him in the stair chair. At 7:23:54, Plaintiff's head can be seen snapping back quickly, but it is not possible to discern from the footage what caused this movement and

there is nothing to suggest it was anything but Plaintiff's continued attempts to resist the officers' efforts.

Plaintiff was escorted off the third floor in the stair chair, at which time he finally became compliant. He was escorted to restrictive housing without further incident. At 7:50 a.m., Plaintiff was seen by medical for a use-of-force assessment. Plaintiff told medical staff that he had smoked K2 for the first time and "I don't know what I do." Plaintiff asked to shower and was promptly taken for a decontamination shower. On recommendation of medical staff, Plaintiff was transported to an outside hospital, where he was found to have a closed head injury, a bruised left eye, pain and swelling of his left elbow, and a fracture of the fifth metacarpal bone of his right hand, known as a Boxer's fracture. Surgery was recommended to treat Plaintiff's fracture. After evaluation at the outside hospital, Plaintiff was transported to Alexander Correctional Institution for housing. Plaintiff was charged with three disciplinary infractions, including assault on staff, disobeying several direct orders, and substance possession, and with several felonies in Avery County, North Carolina, stemming from the incident.

On January 6, 2022, Plaintiff was seen by an orthopedic surgeon, Timothy Kirkland, M.D., for a consultation. At this appointment, Plaintiff reported that he did not remember how he injured his right hand on December 23, 2021. Plaintiff had surgery to repair his hand a week later. On January 26, 2022, Plaintiff returned to Dr. Kirkland for a follow-up appointment. Dr. Kirkland reported that Plaintiff "states he was told by his lawyer to update his record. He states he now vividly remembers getting struck in the hand by a baton while in prison[.]" Plaintiff returned to Dr. Kirkland on February 28, 2022, at which time Dr. Kirkland noted that Plaintiff's fracture was "healed."

## IV. DISCUSSION

### A. Exhaustion

The PLRA requires a prisoner to exhaust his administrative remedies before filing a § 1983 action. 42 U.S.C. § 1997e(a). The PLRA provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Id. In Porter v. Nussle, the Supreme Court held that the PLRA's exhaustion requirement applies to all inmate suits about prison life. 534 U.S. 516, 532 (2002). The Court ruled that "exhaustion in cases covered by § 1997e(a) is now mandatory." Id. at 524 (citation omitted). The Porter Court stressed that, under the PLRA, exhaustion must take place before the commencement of the civil action to further the efficient administration of justice. Id.

In Woodford v. Ngo, the Supreme Court held that the PLRA exhaustion requirement requires "proper" exhaustion: "Administrative law . . . requir[es] proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).'" 548 U.S. 81, 90 (2006) (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir. 2002)). Further, "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." Jones v. Bock, 549 U.S. 199, 211 (2007) (citing Porter, 534 U.S. at 524). Because exhaustion of administrative remedies is an affirmative defense, Defendants have the burden of pleading and proving lack of exhaustion. Id. at 216.

Finally, it is well-settled that a prisoner may not exhaust his administrative remedies during the pendency of a Section 1983 action; rather, he must fully exhaust all steps of the administrative

process before filing his lawsuit. See Germain v. Shearin, 653 Fed. Appx. 231, 234 (4th Cir. 2016); French v. Warden, 442 F. App'x 845, 846 (4th Cir. 2011). The North Carolina Department of Adult Correction (NCDAC) has established, in its Administrative Remedies Procedures ("ARP"), a three-step procedure governing submission and review of inmate grievances. See Moore v. Bennette, 517 F.3d 717, 721 (4th Cir. 2008). Inmates are required to exhaust administrative remedies with the NCDAC in accordance with ARP. Id. An inmate does not exhaust his administrative remedies with the NCDAC until he completes all three steps. Id.

Here, Plaintiff submitted a grievance regarding part but not all the alleged events giving rise to this action. [Doc. 68 at 3]. That is, Plaintiff complained that he was assaulted while restrained in the stair chair on December 23, 2021, but he did not complain about anything that occurred before his placement in the chair. [See id.]. The Step One unit response to Plaintiff's grievance provided as follows:

> On 12/23/21, A code 3 was called because inmate was screaming and being disruptive. Officer Warren responded to the code and reported to the inmate's cell. The Offender came out of his cell in an aggressive manner, forcing Officer Warren to use pepper spray on inmate. Inmate began swinging at Officer Warren, hitting him in the arm. Offender also tried to assault responding officer. Offender would not stop trying to assault the officers responding to this incident. The Officers had to use batons to get inmate to stop his assaultive behavior because the pepper spray did not seem to slow him down.

[Doc. 68 at 4]. The response concluded that the officers involved "accomplished their correctional objective by utilizing only the amount of force needed to subdue the inmate and stop his assaultive behaviors." [Id.]. Plaintiff appealed to Step Two, where the facility concluded that the Step One response "adequately addressed [Plaintiff's] concerns." [Id. at 5]. Plaintiff appealed to Step Three. [Id. at 2]. Noting that Plaintiff was charged with three infractions related to the incident – substance possession, assaulting staff, and disobeying an order, the Grievance Examiner found

9

that the grievance should have been rejected at the facility level as outside the scope of the ARP because it challenged aspects of a disciplinary infraction. [Id. (citing ARP .0306(b)(3))]. The grievance, therefore, was dismissed as outside the scope of the ARP. [Id.].

Defendants argue that Plaintiff's claim against Defendant Hughes should be dismissed because Plaintiff's grievance complained only about his treatment in the stair chair, not about any preceding events, and it is undisputed that Defendant Hughes did not interact with Plaintiff in the stair chair. [Doc. 65 at 7]. Defendants argue, therefore, that Mountain View officials did not have fair notice of or the opportunity to address the present claim against Defendant Hughes. [Id.]. Defendants' argument is not well taken. Although Plaintiff did not specifically complain about events that preceded his placement in the stair chair, the Step One response focused on the initial response to Plaintiff's disruptive behavior, including Officer Warren's use of pepper spray on the Plaintiff and Defendant Hughes' use of a baton on Plaintiff after he was unphased by the pepper spray. [Doc. 68 at 4]. In concluding that the officers involved used "only the amount of force needed to subdue the inmate and stop his assaultive behavior," the Step One response addressed the portion of the incident about which Defendants now claim the facility did not have fair notice. [See id.; cf. Doc. 68 at 3]. This result was upheld by the facility at Step Two, and, at Step Three, the grievance was dismissed as outside the scope of the ARP because it involved conduct incident to Plaintiff's disciplinary infractions. As such, even if Plaintiff had specifically mentioned Defendant Hughes' alleged conduct in his grievance, the facility had notice of and responded to that portion of the incident and the ultimate resolution of the grievance would have been the same. The Court, therefore, will deny Defendants' motion for summary judgment on this ground.

10

Case 1:23-cv-00098-FDW Document 81 Filed 02/13/25 Page 10 of 14

## 2. Excessive Force

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments," U.S. CONST. amend. VIII, and protects prisoners from the "unnecessary and wanton infliction of pain," Whitley v. Albers, 475 U.S. 312, 319 (1986). To establish an Eighth Amendment claim, an inmate must satisfy both an objective component – that the harm inflicted was sufficiently serious – and a subjective component – that the prison official acted with a sufficiently culpable state of mind. Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996).

This subjective standard requires proof of malicious or sadistic action by a prison official to make out an excessive force claim. This is because prison "[o]fficials are entitled to use appropriate force to quell prison disturbances." Williams, 77 F.3d at 761. "Because officials must act 'in haste, under pressure, and frequently without the luxury of a second chance,' deliberate indifference is not a sufficiently rigorous standard." Id. (citing Whitley, 475 U.S. at 320). "Rather, in these circumstances, in order to make out an Eighth Amendment claim, a prisoner must demonstrate that officials applied force maliciously and sadistically for the very purpose of causing harm." Id. (internal quotations and citation omitted).

In considering the subjective component, the Court looks to 1) "the need for the application of force"; 2) "the relationship between the need and the amount of force that was used"; 3) "the threat … reasonably perceived by the responsible official"; and 4) "any efforts made to temper the severity of a forceful response." Whitley, 475 U.S. at 321. Moreover, "[c]orrectional officers do not have to be under physical attack to justify the use of force; they can also use appropriate force 'to preserve internal order by compelling compliance with prison rules and procedures.'" Shiheed v. Harding, 802 Fed. App'x 765, 767 (4th Cir. 2020) (quoting Brooks v. Johnson, 924 F.3d 104, 112 (4th Cir. 2019)). "'And we owe officers wide-ranging deference in their determinations that

11

force is required to induce compliance with policies important to institutional security.'" Id. (quoting Brooks, 924 F.3d at 112).

Defendants here have shown the lack of a genuine issue for trial. Defendants show that Plaintiff was under the influence of K2; that he was assaulting officers, combative, resistive, and continuously refusing direct orders; and that hands-on force was necessary to initially restrain him and to place him in the stair chair, which was necessary for safe transport. The forecast of evidence plainly shows that Defendant Hughes used only that amount of force reasonably necessary to gain control of Plaintiff and restore order and did not apply force maliciously or sadistically to cause harm. The forecast of evidence also shows that Defendant Ramsey used hands-on force to secure Plaintiff, who remained combative and continued to resist and refuse orders, in the stair chair to safely transport him down the stairs. From this forecast, no reasonable jury could conclude that Defendants acted maliciously for the purpose of causing harm. Rather, a reasonable jury would conclude from the forecast that the amount of force used was necessary to gain control of the Plaintiff under all the circumstances and that the officers involved sought to temper the force that was used to gain Plaintiff's compliance. Whitley, 475 U.S. at 321.

While the video footage of the incident shows an officer attempting to lift the resisting Plaintiff off the ground by his restrained hands, which in 20/20 hindsight may not have been effectual to compel compliance, there is no forecast of evidence of the identity of this officer. Moreover, the forecast of evidence shows that Plaintiff's broken hand was a Boxer's facture, an injury common to inexperienced boxers, and that he purported to remember weeks later that it was caused by a baton strike to his hand, not by the officer trying to lift him by his restrained hands. Additionally, Plaintiff forecasts no evidence that any alleged excessive force by Defendants caused this injury. Rather, common sense suggests that he sustained it when he was throwing closed fist

12

punches at the officers who responded to the Code 3. While Plaintiff alleged having suffered a "bruised face" and the forecast of evidence shows that he sustained a black eye and closed head injury during the incident, he forecasts no evidence of how he sustained these injuries or who caused them.

For these reasons, there is not a sufficient forecast of evidence from which a reasonable jury could conclude that Defendants' use of force on Plaintiff violated the Eighth Amendment. Because there is no genuine issue for trial, the Court will dismiss Plaintiff's claim. Because the forecast of evidence does not support that a constitutional right was violated, Defendants would also be protected by qualified immunity. See E.W. ex rel. T.W. v. Dolgos, 884 F.3d 172, 178 (4th Cir. 2018).

## V. MOTION TO SEAL

Defendants move to seal certain records submitted in support of their summary judgment motion, including the Incident Report, Plaintiff's medical records, and Plaintiff's grievance records. [Doc. 69]. Defendants argue that these documents contain prison records which are made confidential under N.C. Gen. Stat. § 148-76 and not subject to public inspection. [Doc. 70 at 1]. Defendants also argue that the interest in keeping these documents sealed outweighs any competing interest for access. [Id. at 3].

Before sealing a court document, the Court must "(1) provide public notice of the request to seal and allow interested parties a reasonable opportunity to object, (2) consider less drastic alternatives to sealing the documents, and (3) provide specific reasons and factual findings supporting its decision to seal the documents and for rejecting the alternatives." Ashcraft v. Conoco, Inc., 218 F.3d 288, 302 (4th Cir. 2000). In the present case, the public has been provided with adequate notice and an opportunity to object to the Defendants' motion. Defendants filed the

motion on November 4, 2024, and it has been accessible through the Court's electronic case filing system since that time. Moreover, the public's right of access to the subject records is substantially outweighed by the competing interest in protecting the substance of such information, including the facility's interest in protecting security-related information. Having considered less drastic alternatives to sealing these Exhibits, the Court concludes that sealing these records is necessary to protect the implicated privacy interests. As such, the Court will grant Defendants' motion to seal and order that Docket Nos. 66 through 68 remain sealed.

VI. **CONCLUSION**

For the reasons stated herein, the Court will grant Defendants' motion for summary judgment and motion to seal.

**O R D E R**

**IT IS, THEREFORE, ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 64] is **GRANTED** and this action is hereby **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Seal [Doc. 69] is **GRANTED** and Docket Nos. 66 through 68 shall remain sealed.

The Clerk is instructed to terminate this action.

**IT IS SO ORDERED**.

Signed: February 13, 2025

Frank D. Whitney
Senior United States District Judge